## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

JAMES J. BUCHER,            )
                                   )
      Plaintiff,            )
                                   )
    vs.                    )       **Case No. 1:06CV41 LMB**
                                   )
MICHAEL J. ASTRUE,[1]     )
Commissioner of Social Security,   )
                                   )
      Defendant.       )

## MEMORANDUM

      This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of James J. Bucher for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 19). Defendant has filed a Brief in Support of the Answer. (Doc. No. 23).

## Procedural History

      On March 26, 2004, plaintiff filed his applications for Disability Insurance Benefits and Supplemental Security Income, claiming that he became unable to work due to his disabling

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action. See Fed.R.Civ.P. 25(d)(1).

condition on April 17, 2003.  (Tr. 145-47).  This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated October 18, 2005.  (Tr. 129-33, 8-17).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on February 17, 2006.  (Tr. 7, 4-6).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.  ALJ Hearing

Plaintiff's administrative hearing was held on April 5, 2005.  (Tr. 20).  Plaintiff was present and was represented by counsel.  (Id.).  Also present were vocational expert John Grenfell and plaintiff's sister, Edna Bucher.  (Id.).  The ALJ began the hearing by admitting the exhibits into the record.  (Tr. 22).  Plaintiff's attorney indicated that plaintiff had recently been diagnosed with diabetes, although there were no medical records related to his diabetes.  (Tr. 21).  The ALJ stated that he would hold the record open for thirty days to allow plaintiff an opportunity to submit medical records from Dr. Kathy Jackson.  (Tr. 23).

Plaintiff's attorney then examined plaintiff, who testified that he was 45 years of age and was right-handed.  (Tr. 24-25).  Plaintiff stated that he was five feet, seven inches tall, and weighed 190 pounds.  (Tr. 25).  Plaintiff testified that he had recently lost 22 pounds due to exercising.  (Id.).

Plaintiff stated that he completed the twelfth grade and that he was in special education classes.  (Id.).  Plaintiff testified that he attended special education classes the entire twelve-year period.  (Id.).  Plaintiff stated that he has trouble reading and writing.  (Id.).  Plaintiff testified that

he can read books or newspapers only if they do not contain "hard words." (Tr. 26). Plaintiff stated that he cannot multiply or divide but he can perform simple addition and subtraction. (Id.). Plaintiff testified that he would require help completing a job application because he cannot spell. (Id.).

Plaintiff testified that at the time of the hearing he was working part-time as a dishwasher at Pizza Hut. (Tr. 26-27). Plaintiff stated that he works eighteen hours a week at this position. (Tr. 27). Plaintiff testified that he does not have problems working eighteen hours a week. (Id.). Plaintiff stated that he has been working at this position for three months. (Id.). Plaintiff testified that he is paid $5.35 per hour. (Id.).

Plaintiff stated that before working at Pizza Hut, he worked at Blair Industries for six-and-a-half years. (Id.). Plaintiff testified that he left that position because the company was sold. (Id.). Plaintiff stated that the company then required that he take a drug test, which he failed. (Id.).

The ALJ then questioned plaintiff, who testified that after the company was bought, all the employees were fired. (Tr. 28). Plaintiff stated that he reapplied for his position with the new owners. (Id.). Plaintiff testified that the new owners required that job applicants be tested for drugs. (Id.). Plaintiff stated that he failed the drug test because he tested positive for alcohol. (Tr. 29).

Plaintiff's attorney then examined plaintiff, who testified that he was not doing any illegal street drugs. (Tr. 30). Plaintiff stated that he was drinking alcohol at the time he took the drug test. (Id.). Plaintiff testified that he had a problem with alcohol in the past. (Id.). Plaintiff stated that he was diagnosed with alcohol abuse by his doctors. (Id.). Plaintiff testified that he quit

drinking because his doctor advised him to stop due to his high blood pressure.  (Id.).

The ALJ questioned plaintiff, who testified that Dr. Jackson advised him to quit drinking and lose weight.  (Tr. 31).  Plaintiff stated that he stopped drinking altogether nine to ten months prior to the hearing because he did not have a job and he did not have any money.  (Id.).  Plaintiff testified that he has not consumed alcohol since he started his job at Pizza Hut three months prior to the hearing.  (Id.).

Plaintiff testified that he only works eighteen hours a week at Pizza Hut because they do not need him to work any more hours.  (Tr. 32).  Plaintiff stated that Pizza Hut calls him if they need him to work more than eighteen hours.  (Id.).  Plaintiff testified that they called him one time to ask him to work an additional six-hour shift.  (Id.).  Plaintiff stated that he works six-hour shifts three days a week.  (Id.).  Plaintiff testified that he would be capable of working forty hours a week at this position, but they will not allow him to work full-time because they do not want to pay him benefits.  (Id.).  Plaintiff stated that he could work at a dishwashing job for forty hours a week if he had transportation.  (Tr. 33).  Plaintiff then testified that he did not think he could work forty hours a week if he had transportation because he gets tired from his medication.  (Id.).  Plaintiff stated that he takes blood pressure medication and Zoloft.  (Id.).  Plaintiff testified that the Zoloft helps him sleep.  (Id.).

Plaintiff's attorney then resumed questioning plaintiff, who testified that he has been diagnosed with depression.  (Tr. 34).  Plaintiff stated that his doctors prescribed Zoloft for his depression.  (Id.).  Plaintiff testified that he occasionally gets "hypered up," where he cannot sit down and must keep moving.  (Id.).  Plaintiff explained that he paces when he is "hypered up" and walks in and out the house.  (Id.).

Plaintiff testified that he has difficulty doing more than one thing at a time. (Tr. 35). Plaintiff stated that if he is asked to do more than one thing he cannot complete the tasks because he forgets to do things. (Id.).

Plaintiff testified that he does not have any problems getting along with other people. (Id.). Plaintiff stated that people like him. (Id.). Plaintiff testified that he does not have problems speaking to other people. (Id.).

Plaintiff stated that he has his own house but he lives with his parents. (Id.). Plaintiff testified that he is living with his parents because his heater and water heater are broken. (Id.). Plaintiff stated that he sleeps on his parents' couch. (Id.). Plaintiff testified that he has a mobile home. (Tr. 36). Plaintiff stated that the mobile home has holes in its floor. (Id.). Plaintiff testified that he lives with his parents because his mobile home is too cold due to the holes in the floor and broken heater. (Id.).

Plaintiff stated that he does not cook because he tends to burn things. (Id.). Plaintiff testified that he forgets he is cooking and watches television. (Id.). Plaintiff stated that he is not a good housekeeper. (Id.). Plaintiff testified that it takes him a couple of weeks before he has the "gumption" to clean. (Id.). Plaintiff stated that he cleans the house every two weeks. (Id.).

Plaintiff testified that his sister or parents take him grocery shopping. (Id.). Plaintiff stated that he often forgets what groceries to buy when he gets to the grocery store. (Id.). Plaintiff testified that he does not make a grocery list. (Tr. 37).

Plaintiff testified that he paid his own bills when he worked. (Id.). Plaintiff stated that he has had his electricity turned off because he forgot to pay the bill. (Id.). Plaintiff testified that on another occasion, he did not have enough money to pay his electric bill. (Tr. 38). Plaintiff stated

that he was able to work with the electric company so they did not turn off his electricity. (Id.).

Plaintiff testified that his mother washes his dishes because he usually eats at her house. (Id.). Plaintiff stated that his mother does his laundry. (Id.). Plaintiff testified that his mother is having a difficult time getting around, so she occasionally instructs plaintiff on how to do the laundry. (Tr. 39). Plaintiff stated that he helps his mother do the dishes. (Id.).

Plaintiff testified that he has five cats. (Id.). Plaintiff stated that he did not have money to buy a litter box when he first got the cats. (Id.). Plaintiff testified that his sister eventually bought him a litter box, but his cats would not use it. (Id.). Plaintiff stated that his cats would relieve themselves anywhere in the house. (Id.). Plaintiff testified that one of his cats, the mother cat, used the litter box. (Id.). Plaintiff stated that the cats would relieve themselves outside in the summer. (Id.). Plaintiff testified that in the winter it was rough because the cats would defecate everywhere in the house. (Id.). Plaintiff stated that he had to remove the rugs in his trailer and burn them due to the smell. (Tr. 40). Plaintiff testified that he placed floor mats on the floors of his trailer after removing the carpet. (Id.). Plaintiff stated that he currently has five cats--the mother cat and four of her litter. (Id.). Plaintiff testified that the mother was pregnant at the time of the hearing, so he would soon have more cats. (Tr. 42).

Plaintiff stated that he does not have a driver's license because he could not pass the driver's test. (Id.). Plaintiff testified that he does not drive. (Id.). Plaintiff stated that he relies on his parents, sister, and nephews to take him to work. (Id.). Plaintiff testified that if they cannot take him to work then he does not go to work. (Id.). Plaintiff stated that he has not lost a job due to lack of transportation. (Id.). Plaintiff testified that his sister picks him up from work at 10:00 p.m because his parents do not stay up that late. (Tr. 43).

Plaintiff testified that he has difficulty concentrating on one task. (Id.). Plaintiff stated that when he cooks, he watches television and forgets about the food he was cooking. (Id.). Plaintiff testified that he cannot do two things at once. (Tr. 44). Plaintiff stated that he will not complete a task if it involves doing more than one thing at a time. (Id.).

When asked if he could perform a job for forty hours a week, plaintiff responded that there are not many jobs out there. (Id.). Plaintiff stated that he was lucky to get the job he has at Pizza Hut. (Id.). Plaintiff testified that he was bored staying at home. (Id.). Plaintiff stated that he got the Pizza Hut job through vocational rehab. (Id.). Plaintiff testified that he went through vocational rehab for about a year. (Id.). Plaintiff stated that vocational rehab tried to find a job for him. (Id.). Plaintiff testified that they found a cleaning job at the mall, but he could not take the job because he did not have his own transportation. (Id.). Plaintiff explained that the position required him to be available to come in on short notice, and he could not rely on his family for transportation with no notice. (Id.).

The ALJ then examined plaintiff, who testified that he has taken the written driving test five times. (Tr. 45). Plaintiff stated that he can pass the driving test but not the written test. (Id.). Plaintiff testified that he was close to passing the test one time but then the next time he did even worse, so he gave up. (Id.). Plaintiff stated that when he took the test 25 to 30 years ago, he took it orally and passed. (Tr. 46). Plaintiff testified that they no longer offer oral tests. (Id.). Plaintiff stated that he was able to get a driver's license 25 to 30 years ago, when he was seventeen. (Id.).

Plaintiff testified that his license was suspended because he got three DWIs. (Id.). Plaintiff stated that he got the first DWI in 1982. (Tr. 47). Plaintiff testified that his license was

suspended for 30 days and he had to take a class. (Id.). Plaintiff stated that he got his second DWI in 1987, and the third in 1993. (Tr. 47-48). Plaintiff testified that his license was suspended for ten years after he got his third DWI in 1993. (Tr. 49). Plaintiff stated that in 2003, after the ten-year suspension expired, he had to re-take the driver's test. (Tr. 49). Plaintiff testified that he has taken the written test and failed numerous times since 2003. (Id.). Plaintiff stated that he requested an oral test but was told that they no longer administer oral tests. (Id.).

Plaintiff testified that he drank heavily in the past. (Tr. 50). Plaintiff stated that he drank two to three cases of beer a week. (Id.). Plaintiff testified that he last drank that amount of alcohol about ten years prior to the hearing. (Id.). Plaintiff stated that he stopped drinking altogether about nine or ten months prior to the hearing. (Id.). Plaintiff testified that he was diagnosed with diabetes and his doctor recommended that he lose weight and stop drinking. (Id.). Plaintiff stated that he also quit drinking nine or ten months prior to the hearing because he did not have any money. (Tr. 51).

Plaintiff testified that his regular treating doctor is Dr. Kathy Jackson. (Tr. 52). Plaintiff stated that he had been treating with Dr. Jackson for three months. (Id.). Plaintiff testified that Dr. Jackson diagnosed him with diabetes and recommended that he stop drinking, exercise, and lose weight. (Id.). Plaintiff stated that prior to seeing Dr. Jackson, he saw a doctor who just prescribed blood pressure medication and Zoloft. (Id.). Plaintiff testified that his diabetes and blood pressure are controlled with medication. (Tr. 53). Plaintiff stated that he feels much better since taking the medication. (Id.). Plaintiff's attorney stated that Dr. Jackson is at Cross Trails and that he would obtain those records. (Id.). The ALJ suggested that plaintiff's sister obtain the records from the doctor who treated plaintiff prior to Dr. Jackson. (Tr. 54).

Plaintiff testified that he cannot lift much because he injured his back several years prior to the hearing while playing football.  (Id.).  Plaintiff stated that he was told that he can lift 48 pounds.  (Id.).  Plaintiff testified that when he worked at Goodwill, they assessed his ability to lift.  (Id.).  Plaintiff stated that Goodwill determined that he could lift about 50 pounds.  (Tr. 55).  Plaintiff testified that he has not tried to lift 50 pounds.  (Id.).  Plaintiff stated that he lifted boxes of canned goods at Goodwill.  (Id.).  Plaintiff testified that the people assessing his skills at Goodwill were not doctors, but rather social workers or "helpers."  (Tr. 56).

Plaintiff testified that he can stand all day long.  (Tr. 57).  Plaintiff stated that sitting hurts his back and legs.  (Id.).  Plaintiff testified that he can sit for a couple hours at a time.  (Id.).  Plaintiff stated that he can walk for six to seven hours before he has to sit down.  (Id.).  Plaintiff testified that he can bend, stoop, and squat, although it is somewhat difficult due to his stomach.  (Tr. 58).  Plaintiff stated that he is able to walk up and down stairs.  (Id.).  Plaintiff testified that he occasionally has muscle pains in his left upper arm.  (Tr. 58-59).  Plaintiff stated that he did not see a doctor for this problem because it stopped hurting.  (Tr. 59).  Plaintiff testified that he can lift and carry 50 pounds for a very short distance before his back starts hurting.  (Id.).  Plaintiff stated that he can occasionally lift and carry 50 pounds short distances of about ten feet.  (Tr. 60).

Plaintiff's attorney then examined plaintiff's sister, Edna Bucher, who testified that she has a close relationship with plaintiff.  (Id.).  Ms. Bucher stated that plaintiff lives across the street from her.  (Id.).  Ms. Bucher testified that she sees plaintiff on a daily basis.  (Tr. 61).  Ms. Bucher stated that plaintiff requires help handling his finances.  (Id.).  Ms. Bucher testified that plaintiff needs someone to keep track of his finances, remind him that bills need to be paid, and help him

budget.  (Id.).  Ms. Bucher stated that either she or their mother helps plaintiff with his finances. (Id.).

Ms. Bucher testified that plaintiff can cook if someone reminds him not to burn the food. (Tr. 62).  Ms. Bucher stated that plaintiff either eats with her or his mother.  (Id.).  Ms. Bucher testified that she drives plaintiff to and from work.  (Id.).  Ms. Bucher stated that she has attempted to help plaintiff get his driver's license.  (Id.).  Ms. Bucher testified that plaintiff does not keep his trailer tidy or organized.  (Tr. 63).  Ms. Bucher stated that plaintiff has to be reminded to clean.  (Id.).

Ms. Bucher testified that she is two years younger than plaintiff.  (Id.).  Ms. Bucher stated that plaintiff had problems when he started school in the first grade.  (Id.).  Ms. Bucher testified that plaintiff's teacher told plaintiff's parents that the school was starting a special education program and recommended that plaintiff attend the program.  (Id.).  Ms. Bucher stated that their father did not want plaintiff to take special education classes.  (Id.).  Ms. Bucher testified that plaintiff's teacher had to go to the school board, who informed plaintiff's parents that he would have to attend special education classes or he would not make it in school.  (Id.).  Ms. Bucher stated that plaintiff attended special education classes from first grade through his senior year of high school.  (Tr. 64).  Ms. Bucher testified that she does not believe plaintiff would have made it through school if he had not been in the special education program.  (Id.).

Ms. Bucher stated that she did not believe plaintiff could work a forty-hour workweek because he has a very short attention span and gets bored easily.  (Id.).  Ms. Bucher testified that plaintiff does not have a problem getting along with other people.  (Id.).  Ms. Bucher stated that plaintiff gets along with just about everybody.  (Id.).  Ms. Bucher testified that plaintiff can follow

instructions if they are very simple. (Id.). Ms. Bucher stated that Goodwill offers on-the-job assistance to plaintiff at his current job. (Id.).

Ms. Bucher testified that plaintiff was born with his impairments and that he spent a lot of time in the hospital as an infant. (Tr. 65). Ms. Bucher stated that her mother cannot read. (Id.). Ms. Bucher testified that her father did not have patience with plaintiff when he was a child. (Id.). Ms. Bucher stated that this caused plaintiff to suffer from anxiety, depression, and low self-esteem. (Id.). Ms. Bucher testified that plaintiff threatened to commit suicide on one occasion. (Id.). Ms. Bucher stated that a neighbor talked plaintiff out of committing suicide. (Id.).

The ALJ then examined Ms. Bucher, who testified that she was 43 years of age. (Id.). Ms. Bucher stated that she was divorced and had two sons, who were aged 23 and 17. (Tr. 66). Ms. Bucher testified that her oldest son is a diabetic and has a girlfriend. (Id.). Ms. Bucher stated that neither one of her sons have or want driver's licenses. (Id.).

Ms. Bucher testified that she works as a housekeeper at Ratliff Nursing Care, which is a nursing facility. (Id.). Ms. Bucher stated that she worked at Fountain Blue Lodge until three months prior to the hearing, where she was a housekeeper, dietary worker, and nurse aide. (Tr. 67). Ms. Bucher testified that she was called in to work at all hours at this position, so she was unable to assist plaintiff in his job search at that time. (Id.).

The ALJ next examined the vocational expert, Dr. John Grenfell, who testified that he had been present throughout the testimony and he had had an opportunity to review the exhibits. (Tr. 67-68).

The ALJ then questioned plaintiff, who testified that he graduated from high school through the special education program. (Tr. 68). Plaintiff stated that he has not received any type

of vocational training. (Id.). Plaintiff testified that Goodwill did not provide any kind of job training but, rather, they just assessed his abilities. (Id.). Plaintiff stated that Goodwill tested him to determine what he was capable of doing and what he would like to do. (Id.). Plaintiff testified that Goodwill provided job coaching when he first started working at Pizza Hut as a dishwasher. (Tr. 69). Plaintiff stated that Goodwill assisted him on the job for a couple of weeks and then gradually stopped coming. (Id.). Plaintiff testified that Goodwill calls him occasionally to see if he needs any assistance. (Id.).

The ALJ then asked Dr. Grenfell to assume an individual with plaintiff's training and past work, with borderline intellectual functioning, with a full scale IQ of 70, verbal IQ of 70, and performance IQ of 75, and who was limited to simple repetitive tasks. (Id.). The ALJ asked Dr. Grenfell if an individual with those IQ scores would have any additional restrictions. (Id.). Dr. Grenfell testified that the individual would be restricted to unskilled or very low semiskilled work activity. (Id.). The ALJ asked Dr. Grenfell to assume those limitations and the additional limitations of very low stress work, and weak visual motor skills and hand-eye coordination. (Tr. 69-70). Dr. Grenfell testified that there are jobs that such an individual could perform. (Tr. 70).

Dr. Grenfell questioned plaintiff, who testified that he worked as a grinder in a plastics factory from 1996 to 2003, where he lifted less than ten pounds. (Id.).

Dr. Grenfell testified that the hypothetical individual could perform plaintiff's past work as a grinder in a plastics factory. (Tr. 71). Dr. Grenfell stated that there are 195 grinders at the light level in Missouri, and 325 at the medium level. (Id.). Dr. Grenfell testified that there are 7,000 grinders nationally at the light level, and 12,000 at the medium level. (Tr. 72). Dr. Grenfell stated that the individual could perform the job as a grinder as it is usually performed in the economy

and how plaintiff actually performed it.  (Id.).  Dr. Grenfell testified that the individual could also perform plaintiff's past cleanup jobs, which he classified as light custodial work.  (Id.).  Dr. Grenfell stated that plaintiff had two cleanup jobs, one between 1980 and 1990, and the other between 1991 and 1993.  (Tr. 73).  Dr. Grenfell testified that the individual could perform plaintiff's past cleanup jobs as plaintiff performed them.  (Id.).

**B.    Relevant Medical Records**

The record reveals that plaintiff was observed by the Division of Vocational Rehabilitation on December 2, 2003.  (Tr. 260-61).  A staff member completed two separate Observed Behavior Checklists.  (Id.).  In the first checklist, it was noted that plaintiff cannot follow through on assigned work in an organized way; often appears lethargic, bored, and without energy; handles his frustration by acting out behavior; has a shorter attention span than most of his peers; cannot adjust readily to changing situations; and has demonstrated behavioral characteristics that would indicate difficulty in adapting to the demands as found in school, the community or the world of work.  (Tr. 260).  On the second checklist, the following was noted:  plaintiff cannot follow through on assigned work in an organized way; often appears lethargic, bored, and without energy; seems to feel inadequate, negative, and puts himself down; has a shorter attention span than most of his peers; does not claim to need help and avoids help when offered; fails to demonstrate acceptable social mannerisms; demonstrates a hostile or defiant attitude; and has demonstrated behavioral characteristics that would indicate difficulty in adapting to the demands as found in school, the community, or the world of work.  (Tr. 261).

Plaintiff presented to Stephen Jordan, Ph.D. on January 5, 2004, for an evaluation of higher cognitive function upon the referral of the Division of Vocational Rehabilitation.  (Tr. 271-

72).  Dr. Jordan stated that plaintiff's examination was notable for intellectual and functional

capacities in the mild range of mental retardation.[2]  (Tr. 271).  Dr. Jordan also noted that plaintiff

appeared to be drinking rather heavily, admitting to consuming three twelve-packs of beer per

week.  (Id.).  Dr. Jordan expressed the opinion that plaintiff was capable of performing unskilled

or semi-skilled labor.  (Id.).  Dr. Jordan diagnosed plaintiff with alcohol abuse and mild mental

retardation, with a GAF[3] of 65.[4]  (Id.).  Dr. Jordan administered intelligence testing, which

revealed a Full Scale IQ of 63.  (Tr. 272).  Dr. Jordan noted that plaintiff's IQ score fell at the

first percentile and in the extremely low range.  (Id.).  Dr. Jordan stated that plaintiff's verbal and

concentration skills were also within the extremely low range while his cognitive processing speed

was borderline at the fourth percentile.  (Id.).

Plaintiff presented to Midtown Family Medical Center on March 22, 2004.  (Tr. 289).

The examining physician noted that plaintiff has suicidal ideations, starts drinking, and has anxiety

---

[2]Mild mental retardation is defined by an IQ score of 50-55 to approximately 70.
Diagnostic and Statistical Manual of Mental Disorders 46 (4th Ed. 1994) ("DSM IV").  As a
group, people with this level of mental retardation typically develop social and communication
skills during the preschool years, have minimal impairment in sensorimotor areas, and often are
not distinguishable from children without mental retardation until a later age.  During their adult
years, they usually achieve social and vocational skills adequate for minimum self-support, but
may need supervision, guidance, and assistance, especially when under unusual social or economic
stress.  With appropriate supports, individuals with mild mental retardation can usually live
successfully in the community, either independently or in supervised settings.  Id. at 41.

[3]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool
wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness" which does "not include impairment in
functioning due to physical (or environmental) limitations."  DSM-IV at 32.

[4]A GAF score of 61-70 denotes some mild symptoms (e.g., depressed mood and mild
insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional
truancy, or theft within the household), but generally functioning pretty well, has some meaningful
interpersonal relationships.  DSM-IV at 32.

attacks.  (Id.).  Plaintiff was diagnosed with depression, alcohol abuse, and elevated blood pressure.  (Tr. 289).  He was prescribed Zoloft.[5]  (Id.).

Plaintiff was seen at Midtown Family Medical Center for a follow-up visit on March 30, 2004.  (Tr. 286).  Plaintiff was diagnosed with hypertension,[6] depression, alcoholism, and alcoholic hepatitis.[7]  (Id.).  Plaintiff was prescribed HCTZ[8] and was instructed to quit drinking.  (Id.).

Plaintiff presented to Midtown Family Medical Center on April 21, 2004 for a follow-up visit, at which time it was noted that plaintiff was feeling good, had more energy, had gone back to work, and had no complaints.  (Tr. 285).  Plaintiff was diagnosed with hypertension, depression, and alcoholic hepatitis.  (Id.).  Plaintiff was continued on Zoloft and HCTZ.  (Id.).

Plaintiff presented to Midtown Family Medical Center on May 27, 2004, at which time it was noted that plaintiff was not taking his medications and he had stopped drinking.  (Tr. 284).  Plaintiff's diagnosis remained unchanged.  (Id.).

`       Plaintiff presented to Midtown Family Medical Clinic on June 10, 2004, for a blood pressure check.  (Tr. 282).  Plaintiff was prescribed Atenolol.[9]  (Id.).

Joan Singer, Ph.D. completed a Psychiatric Review Technique on July 12, 2004.  (Tr.

---

[5]Zoloft is indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, and posttraumatic stress disorder.  See Physician's Desk Reference (PDR), 2676-77 (57th Ed. 2003).

[6]High blood pressure.  See Stedman's Medical Dictionary, 927 (28th Ed. 2006).

[7]Inflammation of the liver due to consumption of alcohol.  See Stedman's at 876.

[8]HCTZ, or Lisinopril, is indicated for the treatment of hypertension.  See PDR at 2070.

[9]Atenolol is indicated for the treatment of hypertension.  See PDR at 686.

198-210).  Dr. Singer found that plaintiff's depression was not severe.  (Tr. 198, 201).  Dr. Singer

expressed the opinion that plaintiff's depression caused mild restrictions of activities of daily living

but no difficulties in maintaining social functioning; maintaining concentration, persistence or

pace; and no repeated episodes of decompensation.  (Tr. 208).

Plaintiff presented to K.P.S. Kamath, M.D. for a psychiatric evaluation on July 20, 2004.

(Tr. 279-80).  Plaintiff's chief complaints were listed as: "stress, drinking, women problems and

special education."  (Tr. 279).  Plaintiff reported that he has suffered from "women problems"

since he married in 1982 and his wife drove him to bankruptcy.  (Id.).  Dr. Kamath noted that

plaintiff had poor dental hygiene.  (Id.).  Dr. Kamath administered a mental status examination,

and noted that plaintiff knew the name of the current president and the prior one but not beyond

President Clinton.  (Tr. 280).  Plaintiff was not able to subtract 7 from 100 serially, and could not

tell Dr. Kamath the meaning of two proverbs.  (Id.).  Plaintiff was free from any psychotic

thought processes and denied any depression, feelings of hopelessness, suicidal ideas, or anxiety.

(Id.).  Dr. Kamath diagnosed plaintiff with alcohol abuse and borderline intellectual functioning,[10]

and assessed a GAF of 65.  (Id.).  Dr. Kamath expressed the opinion that alcoholism was

plaintiff's primary problem.  (Id.).  He stated that plaintiff's borderline intellectual functioning

never interfered with his holding gainful employment, although his drinking resulted in him being

fired from his job.  (Id.).  Dr. Kamath stated that plaintiff's ability to relate to other people was

good, and he was able to care for basic personal needs.  (Id.).  He stated that plaintiff was able to

comprehend and follow instructions and perform simple repetitive tasks.  (Id.).  Dr. Kamath found

---

[10]Borderline intellectual functioning is defined by an IQ in the 71-84 range.  DSM-IV at
684.

that plaintiff's ability to cope with stress and pressures of routine work activity was fair.  (Id.).

Finally, Dr. Kamath stated that plaintiff was able to comprehend and follow basic personal and

financial affairs.  (Id.).

On September 27, 2004, plaintiff saw Georgette Johnson, a licensed clinical psychologist

at New Vision Counseling.  (Tr. 264-65).  Plaintiff did not appear anxious or depressed, and no

peculiarities in his thought processing or behavior were observed.  (Tr. 264).  Dr. Johnson

administered intelligence tests, which revealed a full scale IQ score of 70.  (Id.).  Dr. Johnson

stated that plaintiff's IQ score placed him in the borderline range of intellectual functioning.  (Id.).

 Plaintiff's verbal IQ was 70 and his performance IQ was 75.  (Id.).  Dr. Johnson stated that

plaintiff's full scale IQ was equivalent to a DSM-IV diagnosis of borderline intellectual

functioning.  (Tr. 265).  Dr. Johnson noted that plaintiff's short-term and long-term memory were

impaired and this limits his ability to learn new information and apply previously learned

information.  (Id.).  Dr. Johnson stated that plaintiff's visual motor skills and hand-eye

coordination were additionally weak, which would likely affect his ability to competently perform

physical tasks that require basic assembly.  (Id.).  Dr. Johnson noted that plaintiff's IQ scores

reflect several deficiencies, which are likely to interfere with future learning, academic

performance, and occupational functioning.  (Id.).

Plaintiff presented to Crosstrails Medical Center on February 4, 2005, with complaints of

sinus pressure and drainage.  (Tr. 249).  Dr. Kathy Jackson recommended laboratory testing and

prescribed Zoloft, HTCZ, and Atenolol.  (Id.).

Plaintiff presented to Cross Trails Medical Center on February 17, 2005, for a follow-up

visit.  (Tr. 243).  Dr. Jackson diagnosed plaintiff with diabetes mellitus,[11] poor teeth repair, and

obesity.  (Tr. 244).  Dr. Jackson continued plaintiff on his medications and added Glucophage.[12]

(Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the non-disability requirements for a period of disability and disability insurance benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant has the following "severe" impairments: borderline intellectual functioning with residual deficits.

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant has borderline intellectual functioning with a verbal scale I.Q. of 70, a performance scale I.Q. of 75, and a full scale I.Q. of 70.  The claimant is limited to unskilled or very low skilled work based upon his intellectual functioning.  He is also limited to simple repetitive tasks.  Moreover, his ability to deal with stress and pressure is only fair and he is limited to very low stress work.  Additionally, the claimant's visual motor skills and hand/eye coordination are weak and would likely affect his ability to competently perform physical tasks that involve basic assembly.

7.    The claimant has past relevant work as a grinder as well as two past relevant jobs

---

[11]A chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced.  It is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, water and electrolyte loss, ketoacidosis, and coma.  Stedman's at 529.

[12]Glucophage is indicated for the treatment of Type 2 Diabetes.  See PDR at 1082.

as a cleaner.

8.     The claimant's past relevant work as a grinder and his two past jobs as a cleaner did not require the performance of work-related activities precluded by the claimant's above found residual functional capacity. Thus, the claimant can perform his past relevant work as a grinder and cleaner, as he performed them.

9.     Accordingly, the claimant is not disabled and has not been under a disability, as defined in the Social Security Act, at any time through the date of the decision.

(Tr. 16).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that the claimant is not entitled to a period of disability, disability insurance benefits, and not eligible for supplemental security income payments under Sections 216(i), 223, 1602, and 1614(a)(3)(A), respectively, of the Social Security Act.

(Tr. 17).


## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  <u>See Johnson v. Chater</u>, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  <u>Id.</u>

## B.    <u>The Determination of Disability</u>

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (i) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  <u>See Ingram v. Chater</u>, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); <u>Fines v. Apfel</u>, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.

<u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

 <u>See</u> 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  <u>Id.</u>  Age, education and work experience of a claimant are not considered in making the "severity"

determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document

entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Plaintiff also contends that the ALJ erred in determining plaintiff's residual functional capacity.

## 1.    Credibility Analysis

Plaintiff argues that the ALJ erred in finding plaintiff's subjective complaints of pain and limitation not credible.  Specifically, plaintiff contends that the ALJ did not apply the factors enumerated in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  Defendant argues that the ALJ properly applied the Polaski factors and found plaintiff's subjective complaints to be not totally credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski, 739 F.2d at 1322 (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the

duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. The primary question is not whether plaintiff suffers from the impairments alleged; it is whether plaintiff is fully credible when he claims that the symptoms prevent him from engaging in his prior work. See Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of limitations to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 14). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling impairments. The ALJ first stated that although plaintiff alleges that his intellectual deficits prevent him from working on a sustained basis, plaintiff has had these intellectual deficits throughout his life and he has been gainfully employed on numerous occasions. (Tr. 14). The ALJ noted that there is nothing in the record to indicate that plaintiff's intellectual functioning has changed from the period he was working full-time. The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of a disabling impairment. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992). Further, plaintiff was working part-time at the time of the hearing. Plaintiff's ability to work on a part-time basis during the time in which he alleges he was disabled is inconsistent with plaintiff's allegation of disability and may demonstrate an ability to perform

substantial gainful activity.  See 20 C.F.R. § 404.1571, 416.971; Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994).  Finally, the ALJ noted that plaintiff lost his last job not because of lack of ability, but because he failed a drug test due to his alcohol abuse.  As such, the ALJ properly determined that plaintiff's ability to work despite his mental impairment detracted from his credibility.

The ALJ next discussed the medical evidence. (Tr. 14).  The ALJ found that the medical evidence does not support plaintiff's allegations of disability.  (Id.).  Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).  With regard to plaintiff's mental impairment, the ALJ noted that recent testing administered by Dr. Georgette Johnson has shown that plaintiff's intellectual functioning remains in the borderline range and has not dropped to the mildly mentally retarded range.  (Tr. 14, 264-65).  The ALJ also pointed out that Dr. Kamath expressed the opinion that plaintiff's intellectual deficits had never precluded him from gainful activity.  (Tr. 14, 280).

Plaintiff argues that the ALJ erred in overlooking the January 5, 2004  report of Dr. Stephen Jordan.  Dr. Jordan diagnosed plaintiff with mild mental retardation based on IQ testing, which revealed a full-scale IQ score of 63.  (Tr. 272).  Dr. Jordan also diagnosed plaintiff with alcohol abuse and noted that plaintiff was drinking heavily at the time he was tested, which could of affected his scores.  (Tr. 271).  Notably, Dr. Jordan expressed the opinion that plaintiff was still capable of performing unskilled or semi-skilled labor despite his intellectual deficits.  (Tr. 271).  As such, Dr. Jordan's report would not have bolstered plaintiff's credibility.

Plaintiff also contends that the ALJ erred in ignoring checklists completed by the Missouri Division of Vocational Rehabilitation regarding plaintiff's work-related behaviors. (Tr. 260-61). These checklists, however, provide no explanation for the findings and their author is unclear. There is no indication that a physician or other qualified professional completed the checklists. Further, there is significant evidence, discussed above, that demonstrates plaintiff's ability to perform unskilled work activity.

With respect to plaintiff's physical impairments, the ALJ stated that plaintiff's high blood pressure and diabetes are being treated effectively with medication. (Tr. 14). The ALJ found that there is no indication that these impairments have more than a minimal effect on plaintiff's ability to perform work-related activities. (Id.). This finding is supported by the record and is not disputed by plaintiff.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). Each and every Polaski factor, however, need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of a disabling impairment are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

## 2.  Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining his residual functional capacity. Specifically, plaintiff contends that the ALJ's residual functional capacity determination is too

vague, incomplete, and not supported by specific evidence in the record. Defendant argues that the residual functional capacity formulated by the ALJ is supported by the record as a whole.

After properly determining that plaintiff's subjective complaints were not fully credible, the ALJ formulated the following residual functional capacity:

> Considering the totality of the evidence, the undersigned finds that the claimant has borderline intellectual functioning with a verbal scale I.Q. of 70, a performance scale I.Q. of 75, and a full scale I.Q. of 70. The claimant is limited to unskilled or very low skilled work based upon his intellectual functioning. He is also limited to simple repetitive tasks. Moreover, his ability to deal with stress and pressure is only fair and he is limited to very low stress work. Additionally, the claimant's visual motor skills and hand/eye coordination are weak and would likely affect his ability to competently perform physical tasks that involve basic assembly.

(Tr. 15).

The undersigned finds that the ALJ's residual functional capacity determination is supported by substantial evidence. Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogemeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

In this case, the residual functional capacity formulated by the ALJ combines the

limitations found by Drs. Jordan, Kamath, and Johnson. Drs. Kamath and Johnson both diagnosed plaintiff with borderline intellectual functioning. (Tr. 265, 280). While Dr. Jordan diagnosed plaintiff with mild mental retardation, he still found that plaintiff was capable of performing unskilled or semi-skilled labor. (Tr. 271). Dr. Kamath expressed the opinion that alcoholism was plaintiff's primary problem, and plaintiff's borderline intellectual functioning never interfered with his holding gainful employment. (Tr. 280). Dr. Kamath found that plaintiff was able to comprehend and follow instructions and perform simple repetitive tasks. (Id.). He also found that plaintiff's ability to cope with stress and pressures of routine work activity was only fair. (Id.). Finally, Dr. Johnson found that plaintiff's visual motor skills and hand-eye coordination were weak, which would likely affect his ability to competently perform physical tasks that require basic assembly. (Tr. 265). The ALJ took into account all of these limitations in formulating plaintiff's residual functional capacity.

Plaintiff contends that the ALJ erred in including no findings as to plaintiff's exertional limitations. There is no evidence in the medical record, however, of any physical limitations. The ALJ properly included only the limitations supported by the medical evidence. Thus, the ALJ's residual functional capacity determination is supported by substantial evidence in the record.

**Conclusion**

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this __24th__ day of September, 2007.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE